O

```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
                          LAREDO DIVISION

RICHARD TANSEY,                    §
                                   §
          Plaintiff,               §
VS.                                §   CIVIL ACTION NO. L-06-83
                                   §
TEXAS A&M INTERNATIONAL            §
UNIVERSITY, et al.                 §
                                   §
          Defendants.              §
```

## MEMORANDUM AND ORDER

Plaintiff Richard Tansey, currently pro se,[1] filed a complaint against Defendants Texas A & M International University (TAMIU) and the Texas A & M University System Board of Regents on July 7, 2006. (Docket No. 1.) Tansey makes three claims: (1) national origin discrimination under Title VII of the Civil Rights Act of 1964, (2) retaliation under Title VII, and (3) race and national origin discrimination by a program or activity receiving federal funds under Title VI. (Docket No. 3.) Defendants move for summary judgment. (Docket No. 41.)

### I. BACKGROUND

*A. Tansey's Hiring*

In late 2003, Tansey, then working as an associate professor of marketing at Sultan Qaboos University in Muscat,

---

[1] Tansey was represented by counsel at this suit's commencement.

1 / 20

Oman, applied for a position as a faculty member of TAMIU's College of Business Administration (COBA). On February 3, 2004, Dan Jones, Provost and Vice President for Academic Affairs, offered Tansey employment as an associate professor with an annual term of nine months and an annual salary of $73,000. (Docket No. 41-4, at 2.) Tansey's position was a tenure-track appointment with two years of tenure credit. Id. Tansey was also offered $8,000 summer research grants for 2004 and 2005-- the summers before and after his first year of employment. Id. Tansey was to teach five courses per academic year during his "probationary period, contingent upon effective teaching, research, and service." Id. Tansey accepted the position.

In an email dated February 2, 2004, J. Michael Patrick, interim dean of COBA, asked Tansey if he would serve as the interim chair of the Department of Management, Marketing, and International Business (MMIB). (Docket No. 41-5, at 3-4.) The position would increase Tansey's term to a twelve-month appointment at the same monthly pay rate, raising his annual salary to $97,333. Id. Tansey's start date would move up three months, and his two $8,000 research grants for the summers of 2004 and 2005 would be pushed back till 2005 and 2006. Tansey accepted, (Docket No. 41-5, at 2-3) and began work on June 1, 2004.

*B. July–August 2004: Tansey's "Whistleblower Report"*

In mid-July 2004, Tansey and another professor voted against recommending Alicia Cavazos for admittance to the doctoral program. Dr. Tagi Sagafi-nejad, Director of the Ph.D. Program in International Business, voted in favor of Cavazos and recommended her for admission, after consulting Dean Jacky So, the new dean of COBA, and Dr. Alex Rodriquez, Associate Dean of the department. (Docket No. 58, Ex. 2, at 7) Cavazos was accepted. Sagafi-nejad then visited Tansey to tell him what happened. <u>Id.</u> According to Sagafi-nejad, Tansey quickly became "belligerent and argumentative" and subsequently "charged out of his office in fury." <u>Id.</u> He described Tansey's demeanor as "unprofessional," describing Tansey as "out of control and in no position to have a normal discussion." <u>Id.</u> Sagafi-nejad also used words such as rude, obstreperous, and obstructionist. <u>Id.</u>

On August 3, 2004, Tansey met with Dean So, a meeting which forms the basis of Tansey's retaliation claim. In Tansey's response to the motion for summary judgment, he refers to this meeting as his "administrative whistle blowing declaration" and claims that a "critical element of this whistleblower report" was a "national origins discrimination complaint" because Tansey was given "a discriminatory initial first year contract" compared to Sagafi-nejad. (Docket No. 42, at 13.) However, according to So's notes of the meeting, a "very angry" Tansey

made a lengthy list of complaints, two of which were his salary and the admission of Cavazos. (Docket No. 58, Ex. 1, at 55–57.) Just two days after the meeting, So expressed concern for Tansey saying he "obviously needs help—counseling(?)" and "I hope he will not hurt himself or his son." (Docket No. 58, Ex. 2, at 29.)

Later that same day, Tansey walked "unannounced and unexpectedly" into Dr. Rodriguez's office. (Docket No. 58, Ex. 2, at 30.) According to Rodriquez, Tansey ignored his instructions to leave the door open. Id. Tansey then proceeded to interrogate Rodriguez "as if in a court of law" about the assignment of classes and release time. Id. at 30–31. Unsatisfied with the answers, Tansey demanded the policies in writing and questioned why he himself was not receiving release time.[2] Id. at 31. At one point, the conversation "essentially broke down," and Rodriguez asked him to leave. Id. Rodriguez said Tansey "reacted with even more agitation and stormed out of the office yelling threats." Id. Rodriguez described Tansey as "quite altered to begin with," saying he displayed "threatening behavior" and acted "in a dangerous and erratic manner." Id. at

---

[2] Besides confronting Rodriquez, Tansey sent an email on August 4, 2004, to So requesting the rules and information needed to assign classes to other professors. (Docket No. 58, Ex. 1, at 53.)

30-31. Rodriguez asked that So or another senior faculty member be present in any future meetings with Tansey. Id. at 31.

Provost Jones and Dean So met with Tansey on August 9, 2004. According to Tansey, the conversation involved only his salary. (Docket No. 42, at 22-23.) Jones did not offer Tansey the new contract he requested. Id. at 23.

*C. October 2004: Tansey's Removal as Interim Chair*

In October, two separate incidents led to the removal of Tansey as interim chair. On October 1, 2004, the MMIB faculty held a meeting. (Docket No. 58, Ex. 2, at 33.) According to a second-hand account of the meeting written by Dean So to Provost Jones, the meeting did not go well. Id. One of the professors stormed out because Tansey allegedly called him a "liar." Id. Two other professors left early "expressing similar concerns," and one professor described Tansey as "unprofessional and unstable." Id. Dean So stated that the faculty wished to meet with him on October 4th, and he believed that the faculty was contemplating a vote of "no confidence" in Tansey as interim chair. (Docket No. 58, Ex. 2, at 33.) While it is not clear from the record whether the vote took place, Tansey believes that it did and defends himself in his filings. Id. at 27-28.

The second incident began on October 2, 2004. Sagafi-nejad wrote Tansey an email regarding Tansey's doctoral class. The entire contents are as follows:

> I am writing to share some concerns expressed to me by students and colleagues regarding the above course you are teaching in the PhD program. My intent is to see how you plan to deal with these concerns, and how I and other colleagues can help.
>
> I would like to meet with you and the Dean right after the Wednesday Executive Committee meeting to discuss details. (Docket No. 58, Ex. 2, at 35.)

Sagafi-nejad was perhaps referring to two letters he had received from students in Tansey's class. Id. at 49–50. According to Tansey's response, he attempted to "allay Sagafi-nejad's concerns" by charging him with "illegally interfering" in Tansey's teaching and academic freedom. (Docket No. 42, at 70.) In the reply email Tansey sent to Sagafi-nejad, he questioned whether Sagafi-nejad, the director of the doctoral program, was qualified to teach doctoral classes and whether he had the authority to evaluate doctoral teaching at all. (Docket No. 58, Ex. 2, at 35.) Tansey further accused Sagafi-nejad of violating university grievance procedures and "materially damage[ing]" Tansey's future student evaluations. Id. Tansey concluded the email with the following:

> If you are my superior, you, you [sic] have not notified me of any TAMIU standards to evaluate my teaching. Secondly, if I am your supervisor, please come see me to determine if your behavior constitutes a legitimate activity you are currently pursuing. Please make an appointment with the department secretary, Linda Gribble, between 1-4 PM. Id.

Tansey followed with a "formal written grievance" on October 7, 2004, all in response to Sagafi-nejad's initial three-sentence email. Id., at 36–37.

Dean So met with Tansey on October 15, 2004. Id. at 39. Shortly after, So sent an email to Provost Jones describing the meeting. Id. There Tansey continued to complain about Sagafi-nejad. Id. So and Tansey addressed the matter and concluded by agreeing to meet the following week. Id. However, at the end of the meeting, So told Tansey that he had too many problems and he should step down as interim chair. Id. Tansey said he could not because he needed the money, but So assured him that his salary would not be affected. Id. Tansey again refused. Id. So then presented him with a letter terminating his appointment as interim chair. Id. at 51.

*D. February 2005: Tansey's Nonrenewal and Administrative Leave*

Tansey finished teaching two classes in the fall semester, one doctoral and one undergraduate, receiving student evaluation scores of 2.67 and 4.17 (out of five) respectively. (Dockets No. 42, Ex. 54.) In the Spring, on February 15, 2005, Tansey was informed that his contract with TAMIU would not be renewed. (Docket No. 42, Ex. 22, at 1.) Just two days later, Tansey had a "physical altercation" with another professor, and the TAMIU police had to intervene. (Docket No. 41-2, at 4.) Shortly thereafter, Tansey was placed on administrative leave with pay

and not allowed to return to the building without a police escort. (Docket No. 42, Ex. 23, at 1.) On or about June 2, 2005, TAMIU paid him the $8,000 summer research grant that he would have received had he not been named interim chair. (Docket No. 58, Ex. 2, at 67.)

Tansey pursued an EEOC charge against Defendants and received his right-to-sue letter on March 10, 2006. (Docket No. 2, at 10.) Tansey then filed this suit.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex v. Catrett, 477 U.S. 317, 322 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A disputed fact is material if its resolution could impact the outcome of the action. Anderson v. Liberty Lobby Co., 477 U.S. 242, 248 (1986). Doubts and all reasonable inferences must be resolved in favor of the nonmoving party. Fierros v. Tex. Dep't of Health, 274 F.3d 187, 190 (5th Cir. 2001).

Tansey is proceeding pro se. Pro se filings are liberally construed to include all reasonable inferences that can be drawn

from them. See Haines v. Kerner, 404 U.S. 519, 521 (1972). However, pro se litigants are still required to provide sufficient facts to support their claims. U.S. v. Pineda, 998 F.2d, 22, 23 (5th Cir. 1993). "Mere conclusory allegations on a critical issue are insufficient." Id.

### III. ANALYSIS

As noted above, Tansey's amended complaint makes three claims: (1) national origin discrimination under Title VII, (2) retaliation under Title VII, and (3) race and national origin discrimination by a program or activity receiving federal funds under Title VI.

*A. Title VII Framework*

Title VII makes it unlawful for employers to discriminate against their employees because of race, sex, color, religion, or national origin. 42 U.S.C. § 2000e-2 (2006). Title VII also prohibits employers from retaliating against employees for engaging in activity protected by other parts of Title VII, like complaining of discriminatory behavior or assisting in an investigation of such behavior. 42 U.S.C. § 2000e-3(a) (2006). Analyzing a discrimination or retaliation claim under Title VII requires the three-step analysis first introduced in McDonnell Douglas Corp. v. Green. 411 U.S. 792, 802-04 (1973); McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th 2007). First, a

plaintiff must establish a prima facie case.  McCoy, 492 F.3d at 556.  For a discrimination claim, a plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) others similarly situated were treated more fairly.  Id.; Willis v. Coca Cola Enters., Inc., 445 F.3d 413, 420 (5th Cir. 2006); Urbano v. Cont'l Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998).   A prima facie case of retaliation requires a plaintiff to establish that (1) he participated in activity protected by Title VII, (2) his employer took an adverse employment action against him, and (3) there is a causal connection between the protected activity and the adverse employment action.  McCoy, 492 F.3d at 556.

If the plaintiff establishes a prima facie case, the employer must articulate legitimate, non-discriminatory or non-retaliatory reasons for its actions.  Id. at at 557.  The employer's burden is merely one of production, not persuasion, and no credibility assessments occur at this stage.  Id.  Once the employer meets its production burden, the plaintiff must meet his ultimate burden either: (1) by showing that the employer's offered reasons are false, or (2) by showing that even if the offered reasons are true, another motivating factor is the plaintiff's protected class or activity. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 101-02, 123 S. Ct. 2148,

2155 (2003); Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004); see also Richardson v. Monotronics Int'l, Inc., 434 F.3d 327, 333-36 (5th Cir. 2005) (applying Desert Palace and Rachid to a retaliation claim under the Family Medical Leave Act). Under the first alternative, the plaintiff must rebut each non-discriminatory reason articulated by the employer. McCoy, 492 F.3d at 557.

*B. Discrimination*

Tansey, a "native born American Anglo Caucasian," claims that the terms of his initial contract, including his salary and position, were discriminatory relative to Tagi Sagafi-nejad, an "Iranian born non citizen." (Docket No. 1, ¶¶ 44, 61.) Sagafi-nejad's base salary was $90,000 for a nine-month term, compared to Tansey's $73,000. (Docket No. 58, Ex. 1, at 1.) Additionally, Sagafi-nejad was hired as a full professor and labeled a Killam Distinguished Professor, one of four at COBA. (Docket No. 41-2, at 6.) Tansey was hired only as an associate professor. (Docket No. 41-4, at 2.) Tansey claims these disparities are discriminatory. However, to establish a prima facie case, Tansey must show that others similarly situated to him were treated more fairly than he was.[3] Sagafi-nejad was not

---

[3] Defendants concede that Tansey was a member of a protected class and qualified for his position. (Docket No. 41, at 10.) The Court will assume without deciding that Tansey's initial contractual salary constitutes an adverse employment action.

similarly-situated. The circumstances of alleged similarly situated individuals must be "nearly identical" to that of a plaintiff. Wheeler v. BL Dev. Corp., 415 F.3d 399, 405 (5th Cir. 2005).

Dr. Sagafi-nejad holds both an M.A. and Ph.D. in International Relations from the University of Pennsylvania. (Docket No. 41-2, at 5.) He began his teaching career in 1979 as a lecturer at The Wharton School and subsequently as an assistant professor at the University of Washington. Id. He was also a Visiting Assistant Professor at the University of Texas at Austin from 1980 to 1984. Id. In 1984, he began a seventeen-year term at Loyola College in Maryland where he was promoted to Full Professor in 1993. Id. When TAMIU hired him, he was the Keating-Crawford Chair in International Business at Seton Hall University. Id. He was hired the year before Tansey as Professor of International Business, the Director of the Ph.D. Program in International Business, and as Acting Chair of MMIB. (Docket No. 58, Ex. 1, at 1.)

Tansey's resume shows he has an M.A. and Ph.D. in History from the University of Texas at Austin. (Docket No. 58, Ex. 1, at 35-41.) He also received an M.B.A. in Quantitative Management in 1989 and a second Ph.D. in Marketing from the University of Houston in 1991. Tansey was an Assistant Professor of Marketing at the University of Wisconsin and

Louisiana Tech University between 1989 to 1994. <u>Id.</u> He served as an Associate Professor at the University of Alaska-Fairbanks from 1994 to 1997, the University of Wollongong in Australia for one year from 1998 to 1999, Hong Kong Baptist University from 1999 to 2002, and Sultan Qaboos University in Muscat, Oman from 2002 to 2004. <u>Id.</u> Sultan Qaboos University is unaccredited. (Docket No. 41-2, at 5.)

Defendants highlight three differences between the two men. First, prior to his hiring, Sagafi-nejad was a full professor for over ten years and held an endowed position at Seton Hall, while Tansey has never been more than an associate professor. (Docket No. 41-2, at 5.) Second, Sagafi-nejad worked for an accredited university while Tansey worked for an unaccredited university in a developing country. <u>Id.</u> at 6. Third, there are differences between Sagafi-nejad's and Tansey's disciplines, namely international business and marketing, respectively. <u>Id.</u>

Tansey does not directly address the differences Defendants highlight. Instead, Tansey first argues that he is more qualified than Sagafi-nejad, because he published more articles and his Ph.D. in Marketing is from a school accredited by the Association of to Advance Collegiate Schools of Business (AACSB) while Sagafi-nejad's doctorate in International Relations is not. (Docket No. 42, at 39-40; Docket No. 58, at 4-6.) This argument is unpersuasive given that Sagafi-nejad's teaching

career began over a decade earlier with over ten years as a full professor at accredited universities.

Next, Tansey argues that they were similarly situated because Sagafi-nejad also served as interim chair of the MMIB program.[4]  (Docket No. 58, at 1-2.)  Serving in the same position, alone, is insufficient. Sagafi-nejad was concurrently the Director of the Ph.D. Program in Internal Business and a full professor while he served as chair.  Further, Sagafi-nejad had greater qualifications-the length of his career, being a full professor, holding an endowed position, and working at an accredited university.  The fact that two people once held the same title does not necessarily make them "similarly situated" with respect to background and qualifications.

Finally, Tansey points to similar coding on the two men's budget forms and notes that the same people who hired Sagafi-nejad hired him.  (Docket No. 42, at 39—40; Docket No. 58, at 3-6.)  Having identical "effective dates," etc. on budget forms is not evidence that proves Tansey and Sagafi-nejad were similarly situated for Title VII purposes.  Nor is an apparent clerical error calling Sagafi-nejad an associate professor on one of his forms, when the record clearly establishes he is a full professor.  (Docket No. 58, Ex. 1, at 1-2.)  Further, just

---

[4] Technically, Sagafi-nejad's contract says "Acting Chair," but it is unclear how this differs from "interim chair."

because two employees are hired by the same people does not mean they are similarly situated. Consequently, because Tansey and Sagafi-nejad were not similarly situated, Tansey has failed to establish a prima facie case and fails to sustain his Title VII discrimination claim.

*C. Retaliation*

Tansey claims he was removed as interim chair and his contract was not renewed in retaliation for complaining about disparate pay and "racial and national origin discrimination" at his meeting with Dean So on August 3, 2004. (Docket No. 1, ¶¶ 43, 51–53, 62.) Most of Tansey's complaints do not constitute protected activity. (Docket No. 58, Ex. 1, at 55–57.) However, complaints about his allegedly discriminatory salary and the admission of Cavazos are at least colorable. Arguendo, Tansey has established a prima facie case.

Defendants offer Tansey's behavior as a legitimate, non-discriminatory reason for his removal as chair and nonrenewal.[5] Defendants assert that Tansey demonstrated rude, belligerent, and unprofessional behavior. Id. Provost Jones's affidavit

---

[5] Another reason Defendants rely on is Tansey's student evaluations score of 2.67 (out of five) for his doctoral class, which ranked near the bottom of all professors at the University. (Docket No. 41, at 12, 42-2, at 4.) Tansey persuasively argues that scores for exceedingly small class sizes, like his class of seven, are inherently unreliable. (Docket No. 42, at 50.) Moreover, eight of the twenty lowest ranks at the university were from COBA faculty, and they were not fired. (Docket No. 42, at 60, Ex. 54, at 2, Ex. 55, at 1.)

states that the administration began receiving both written and verbal complaints about "the erratic, aggressive, and intimidating behavior of Dr. Tansey" in August 2004. (Docket No. 41-2, at 3.) Defendants have met their production burden.

Tansey can proceed either by showing the reason is false or by showing that even if the reason is true, another motivating factor is retaliation for Tansey's "protected activity." Under the first approach, Tansey fails. Tansey *himself* submits several emails and other documents from the faculty and staff of COBA describing Tansey's conduct as "rude," "unprofessional," "belligerent," "argumentative," "obstructionist," "outrageous," "obstreperous," "condescending," "threatening," throwing "temper tantrums," yelling threats, "altered," "out of control," and "unstable." (Docket No. 58, Ex. 1, at 42-43, 55-57, Ex. 2, at 7, 31, 33.) There were also instances of Tansey charging out of offices in a fury. (Docket No. 58, Ex. 2, at 7, 30-31, 39.) Dean So expressed concern that Tansey might need help, and he hoped that Tansey does not "hurt himself or his son." Id. at 29. Tansey claims these comments represent an attempt to "deliberately defame[]" him (Docket No. 42, at 54), presumably meaning that none of Defendants' evidence is true. However, Tansey provides no evidence to rebut those charges.

Instead, Tansey makes four cognizable arguments. First, he asserts that TAMIU is supposed to make employment decisions

based on "meritorious, non-discretionary reasons that are quantifiable or measurable." Id. at 45-46. This argument is presumably based on TAMUS BOR System Regulation 33.99.01, stating that employment decisions will not be made on the basis of any "protected status," such as race, sex, or religious affiliation. (Docket No. 58, Ex. 1, at 16-17.) In this case, TAMIU is relying on behavioral factors apart from any protected status. Further, Tansey does not explain how repeated inappropriate behavior should be quantified or measured other than as done here by TAMIU. Second, Tansey argues that he was never formally evaluated. (Docket No. 42, at 47.) He relies on language in his employment contract providing that his teaching and service will be determined in annual evaluations. (Docket No. 41-4, at 2.) The cited contractual language does not detail any particular form for an evaluation, and the record reflects several meetings with Tansey to discuss his behavioral problems. Further, the quoted contract language refers to determining Tansey's "teaching assignment," not necessarily his overall fitness. (Docket No. 41-4, at 2.) Moreover, the ultimate issue before the Court is not whether a contract violation occurred, but rather whether TAMIU's actions were based on retaliation for Tansey's complaints of discrimination. Third, Tansey argues that the administrators had no experience in "AACSB internationally accredited business doctoral programs" and,

thus, lacked the expertise necessary to evaluate his abilities or behavior. Id. at 52. He does not explain how these programs would furnish "expertise" in recognizing inappropriate conduct. Indeed, taking that argument to its logical conclusion, no one but Tansey himself and a "close personal friend," Ned Koch, would have been qualified to evaluate his behavior. (Docket No. 42, at 51-52.) Finally, Tansey offers character references that were apparently submitted with his application for employment with TAMIU. Id. at 54-55. These letters, written before Tansey began work at TAMIU, are irrelevant to determining how Tansey behaved after he was hired.

Tansey fails to produce any other evidence showing retaliation as a motivating factor in his removal and termination. Even assuming Tansey's meeting with Dean So was protected activity, at best Tansey can argue that Dean So and Provost Jones had knowledge of his complaints and the employment actions occurred after they acquired knowledge. This is not sufficient evidence from which a jury may infer that retaliation was the real motive. See McCoy, 490 F.3d at 562 (finding evidence of knowledge and timing sufficient for prima facie causation, but insufficient to show a retaliatory motive where supervisors never "engaged in racially discriminatory conduct" and black plaintiff never presented evidence that similarly-situated white employees were treated differently); Robertson v.

Alltel Info. Servs., 373 F.3d 647, 656 (5th Cir. 2004) ("[T]he sole evidence of Alltel's retaliation is that the reduction-in-force occurred after the discrimination complaints. . . . Without more than timing allegations, . . . summary judgment in favor of Alltel was proper.").

Tansey has failed to create a fact issue regarding his Title VII retaliation claim.

*D. Race and National Origin Discrimination by an Entity Receiving Federal Funds under Title VI.*

Title VI prohibits discrimination based on race, color, or national origin by recipients of federal financial assistance. 42. U.S.C. § 2000d (2006); Alexander v. Sandoval, 532 U.S. 275, 278, 121 S. Ct. 1511, 1515 (2001). Title VI claims are analyzed under the same framework as claims arising under Title VII. Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311 (5th Cir. 1999). Accordingly, for the reasons outlined in the Title VII analysis, his Title VI claim fails.[6]

---

[6] Defendants also allege that Texas A & M International University and Texas A & M University System Board of Regents are distinct entities and Tansey was only employed by the former. (Docket No. 41, at 19.) While that allegation is likely true, the record is devoid of any supporting evidence for it. Because of the conclusions reached in this Memorandum and Order, it is not necessary to consider this issue.

## IV. CONCLUSION

Consistent with this opinion, Defendants' Motion for Summary Judgment (Docket No. 41) is GRANTED.

DONE at Laredo, TX, this 24th day of March, 2009.

_____
George P. Kazen
United States District Judge